THOMAS JENSON V. TOM JENSON.

No. 15,168.    (91 Pac. 86.)

SYLLABUS BY THE COURT.

1. FINDINGS BY A REFEREE—*Setting Aside—Review.*    Where a referee's report contains all the evidence, a judgment contrary to his findings cannot be upheld on review upon the theory that the trial court had any means of information as to the facts not open to him or any better opportunity than this court to determine the force and effect of the testimony.

2. TRUSTS AND TRUSTEES—*Constructive Trust—Evidence.*    The evidence examined and held to support the findings of the referee.

Error from Morris district court; OSCAR L. MOORE, judge.    Opinion filed July 5, 1907.    Reversed.

*Humphrey & Humphrey,* and *John Maloy,* for plaintiff in error.

*Roark & Roark,* and *M. B. Nicholson,* for defendant in error.

The opinion of the court was delivered by

MASON, J.: A life-interest in real estate in England vested in Margaret Jenson by the terms of a will, which also provided that upon her death the property should go to her husband, Thomas Jenson, for his life (he to educate and maintain her children out of it), and that upon his death the executors should sell it and divide the proceeds among her children or their heirs. She died in 1882, the only beneficiaries under the will surviving her being her husband and their son, Tom, who was born in 1875. In 1899, by what was understood to be their joint consent, the property was sold, the executors and the father and son uniting in the deed. The consideration was £3000, which was paid to the father, who came to this country, accompanied by his son, and invested it largely in the purchase and improvement of lands for a cattle ranch, taking the title in his own name.

In 1903 the son began a suit against his father, alleging in substance that he had never known until a short time before that the will referred to gave him any interest in the English property; that his father had fraudulently concealed the fact from him and had induced him to sign the conveyance by leading him to believe that it was purely a formal matter, and had procured the coöperation of the executors by representing to them that the purpose of the sale was to procure funds to be invested in land in America for the benefit of Tom, and by promising that such plan should be carried out. The plaintiff therefore asked to be declared the absolute owner of all property into which such proceeds could be traced. The defendant answered denying the allegations of fraudulent concealment and misrepresentation, and taking the position

that he held a life-interest in such property, his son being the remainder-man.

The case was tried before a referee, who made detailed findings of fact and conclusions of law in effect sustaining the defendant's contention as to the principal matter in controversy. The court, however, took a different view of the evidence, and, setting aside so much of the referee's report as was inconsistent therewith, gave judgment for the plaintiff. The defendant prosecutes error.

The evidence was partly oral and partly in the form of depositions. Circumstances were narrated from which different inferences might be drawn, and there was some direct conflict of testimony. The brief of the defendant in error contains a suggestion that in the course of other litigation the trial court had acquired information material to the resolution of these contradictions not available to the referee or to this court, and that its conclusions regarding them should therefore control. This is not a consideration that can be given weight here. Inasmuch as the referee's report set out the evidence in full, "the testimony is presented to this court in the same form as it was to the district court, and hence we have the same opportunity which that court had to determine its force and effect." (*Fountain v. Kenney*, 66 Kan. 797, 72 Pac. 392.)

In behalf of Tom Jenson a theory is presented which was outlined in his petition: that he is entitled to recover because of representations made by his father to the executors to induce them to execute the deed to the English property. We cannot perceive that properly there is such an issue in the case. The executors had no power of alienation except as they derived it from the joint consent of the father and son. Their act was merely formal. Practically, Tom Jenson, being entitled to the proceeds of a sale of the property at his father's death, was the owner, subject to his father's life-interest. Any disposition of the property or its proceeds to which he and his father might agree

was a matter of no concern to any one else. He was of full age, and not under guardianship. The sale was effective only because of his participation in it. The real questions in dispute are: (1) Was his consent to the transaction fairly given with a full understanding of his rights, or was it obtained by a fraudulent concealment of the terms of the will, by which he was deceived into a belief that he had no substantial interest in the matter? And (2) if no fraud was employed, what was the agreement between himself and his father as to the disposition of the proceeds of the sale —was it that the new property purchased was to be absolutely his own, or that the American real·estate should be held as that in England had been—the life-estate in the father, the remainder in the son?

Upon the question of fraud there was a direct conflict of oral testimony between the parties. That of Thomas Jenson was explicitly corroborated by the deposition of the lawyer who arranged the details of the sale, to the effect that he fully explained to the plaintiff his rights at the time of its completion. The other evidence affecting the matter was largely negative or circumstantial. The referee by necessary implication, although not in express language, found against the plaintiff on this issue, and we see no sufficient reason for disturbing the finding.

To establish his claim to the absolute ownership of the American property the plaintiff relied upon evidence that his father at various times had stated that his purpose was to use the proceeds of the English property to buy a cattle ranch for Tom—to start Tom in business; that he himself should remain in this country but a short time; that he had other means sufficient for his support. These expressions, however, and others of the same general import shown by the record, are consistent with the idea that while the lands were to be bought with especial reference to Tom's interests—were to afford him a present occupation and ultimately to become his—his father was to

enjoy a life-estate in them. No witness professed to have heard the defendant declare unequivocally that he was to renounce such interest on his part. Tom's own version of his father's promise was thus expressed: "He said he would come to America, and we would invest the money in a ranch, and I should share it with him." Upon the issue so presented the referee made the following finding, the portion thereof enclosed in parenthesis being afterward stricken out by the court as not supported by the evidence:

"At the time of the sale of said property known as the Hare and Hounds it was the intention of both plaintiff and defendant that the proceeds derived from said sale should be brought to the United States and invested in a cattle ranch for the purpose of establishing the plaintiff in business, (but it was not the intention at that time of either the plaintiff or the defendant that the defendant should part with or forfeit his life-interest in the proceeds derived from the sale of said Hare and Hounds property.)"

It is unquestionably true that there was much in the relations and conduct of the parties to afford just ground for doubting the good faith of the father, and that a plausible argument can be made in favor of the son's contentions. But the case is peculiarly one in which the appearance and bearing of the parties upon the witness-stand may have been of great value in deciding between them—may have been a determining factor. We deem it unnecessary to review the evidence more in detail or to recite the considerations which might be thought to support one view or the other. The finding quoted is substantially to the effect that the father and son agreed that the interest of each in the property sold should attach to the proceeds and follow them into whatever form they might assume. We cannot say that such finding was without support in, nor that it was against the weight of, the evidence.

An incidental finding upon which the court differed with the referee had relation to a lease of the ranch from the father to the son, signed by both parties. The

plaintiff claims that this lease was a sham; that it was executed to deceive a third person. The referee found otherwise. The matter seems a fair one for his determination. But in any event the matter is not very material. The lease is important chiefly as an acknowledgment by the son of his father's title. If his story is true, such acknowledgment was made in ignorance of his rights and did not bind him; if it is untrue, the acknowledgment was superfluous. Moreover, the lease was pleaded in the answer, and the reply tendered no issue regarding it except by alleging that the plaintiff entered into it not knowing that he was the owner of the land.

The referee also made findings, which are not challenged, settling various minor disputes, and establishing that the defendant still has on hand a part of the proceeds of the sale of the English property, amounting to $679.32. His conclusions were that the plaintiff was the owner of this and of the lands referred to, subject to a life-interest of the defendant, and that the costs of the action should be divided. It results from what already has been said that the judgment must be reversed and the cause remanded, with directions to enter a decree in accordance with the facts as found by the referee. The matter of costs, however, rests in the discretion of the district court, and there are obviously good grounds for permitting their recovery by the plaintiff. The defendant asserted in his answer that he was ready, and had been at all times, to assure to the plaintiff, by any proper instrument, his interest in the lands in controversy—that is to say, the title to them subject to his father's life-estate. The evidence showed that a few weeks before the suit was begun. Tom was advised by a letter from his father that his rights as remainder-man were recognized, but it does not appear that any offer was ever made, excepting that contained in the answer, to give legal effect to such recognition or to make it a matter of record. The plaintiff therefore was entitled to relief in this

respect, as well as to an accounting. So far as the real estate is concerned, he can be protected by a judgment declaring his interest. · As to the money, in the absence of an agreement between the parties an order will have to be framed to meet the occasion.